# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 06-2245

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Horasio Herrera-Gonzalez, | * | Southern District of Iowa. |
| | * | |
| Appellee. | * | |
| | * | |
| | * | |
| | * | |

_____

Submitted: October 17, 2006
Filed: January 26, 2007

_____

Before WOLLMAN, RILEY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

The Government appeals the district court's decision to grant Horasio Herrera-Gonzalez's motion to suppress evidence seized after a search of his car during a traffic stop.  Because we believe the traffic stop was lawful and, even if it was not, Herrera-Gonzalez's voluntary consent to the search purged any arguable taint of the stop, we reverse.

## I. BACKGROUND

During the clear mid-morning of July 18, 2005, Dallas County Deputy Sheriff Scott Faiferlick had been traveling for some distance behind Herrera-Gonzalez's vehicle eastbound on Interstate 80, a four-lane interstate with two lanes each direction. Faiferlick observed the vehicle cross the fog line on the right side of the right lane for "about 10 to 15 seconds." Prior to this observation, Faiferlick had not observed any other violations or unusual driving. At the time Herrera-Gonzalez crossed the line, two tow trucks were 50 to 100 yards ahead, partly in the median and partly on the left shoulder of the highway. Nothing was blocking the right shoulder when he crossed the fog line. Prior to reaching the tow trucks, however, Herrera-Gonzalez moved back into the right lane of travel as he approached a short bridge that was just before the tow trucks. After crossing the bridge, Herrera-Gonzalez "hugged" the fog line until he passed the tow trucks, at which point he resumed travel in the center portion of the right lane. Herrera-Gonzalez testified that he crossed the fog line to avoid the tow trucks. Faiferlick testified that there was no need to cross the fog line to avoid the trucks and that he believed it was unsafe to cross the line. Based upon the fog-line crossing and his concern that the driver might be impaired or tired, Faiferlick stopped Herrera-Gonzalez for violating Iowa Code § 321.306, which requires that "[a] vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

As Faiferlick pulled the vehicle over, he called the California license plates in to dispatch. The plates came back "not on file," which according to Faiferlick meant that there was no record for the plate or that it was an invalid plate. When Faiferlick approached the vehicle, he could see that Herrera-Gonzalez was not impaired, asleep or intoxicated. Herrera-Gonzalez told Faiferlick his name was Jose Rodriguez and produced a California driver's license bearing the name Jose Rodriguez, as well as the vehicle's registration and proof of insurance. Faiferlick then asked Herrera-Gonzalez

to accompany him to his patrol car, which he did. While Herrera-Gonzalez was in the patrol car, Faiferlick asked him where he was going, where he was coming from, and the nature of his employment. Faiferlick also tried but failed to verify Herrera-Gonzalez's driver's license and issued Herrera-Gonzalez a written warning for improper use of lanes. Herrera-Gonzalez offered to retrieve documents from a briefcase in his car that allegedly would verify his identity, but Faiferlick declined the offer. Shortly thereafter, Faiferlick asked if he could retrieve the documents and asked for consent to search the vehicle. Herrera-Gonzalez claimed he consented to have Faiferlick retrieve the verifying documents only, while Faiferlick contended that the consent was not limited in any way. Faiferlick had written consent forms in his vehicle, but did not provide one to Herrera-Gonzalez or inform him of his right to refuse consent.

The search revealed a hidden compartment behind the rear seat of the car that Faiferlick believed contained controlled substances. Upon finding the compartment, Faiferlick placed Herrera-Gonzalez in handcuffs, resumed his search, and through the use of a fiber-optic scope observed numerous packages inside the compartment. After observing the packages, Faiferlick returned to his patrol car, noticed that the videotape that he thought was recording the stop had ended, and placed a new tape in the recorder. Faiferlick testified that approximately 30 minutes elapsed between the time his tape stopped and the time he inserted the new tape. In an effort to remedy the lapse in videotaping, Faiferlick called Deputy Adam Infante so that a third party could witness him reading Herrera-Gonzalez the *Miranda*[1] rights. During the call, Herrera-Gonzalez confirmed that he had given consent to search the car. After law enforcement officers later found 14 kilograms of cocaine in the hidden compartment, Herrera-Gonzalez again confirmed in an interview with Infante that he had given Faiferlick consent to search his vehicle. Herrera-Gonzalez did not indicate in either of the subsequent affirmations that the consent had been limited in any way.

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

-3-

The district court concluded that the stop violated the Fourth Amendment because Faiferlick did not have an objectively reasonable basis to believe a traffic violation had occurred. The court found that there was "no factual basis for a conclusion that the Defendant's modest movement from his lane of travel could not be 'made with safety'" and that the fog-line crossing could reasonably be interpreted as an attempt to give the tow truck workers more room. Moreover, the district court noted that Faiferlick did not pursue any line of questioning that would have investigated his alleged suspicion that Herrera-Gonzalez may have been tired or intoxicated. The court did not make factual findings as to whether Herrera-Gonzalez stayed in his lane "as nearly as practical" or whether he had "ascertained" prior to crossing the line that his move could be made safely.

With respect to the scope of Herrera-Gonzalez's consent, the district court found Faiferlick's testimony more credible than Herrera-Gonzalez's, concluding that he had not limited his consent.[2] The court went on to conclude, however, that the consent was not sufficient to purge the taint of the illegal stop because: (1) the temporal proximity between the stop and the consent was unclear, but was no more than 20 minutes and could have occurred within a few minutes after the first tape ran out (some 4 minutes after the stop began) or some 15 minutes later; (2) there were no intervening circumstances between the stop and the consent; and (3) the purpose and flagrancy of Faiferlick's misconduct weighed in favor of Herrera-Gonzalez. As support for its official-misconduct conclusion, the district court noted the unreasonable basis for the stop and questioned Faiferlick's purpose in seeking consent to search where the only perceived violation was a fog-line crossing. According to the district court, these facts and Faiferlick's questions regarding Herrera-Gonzalez's travel itinerary and employment suggested a "quality of purposefulness" in

---

[2]The district court also concluded that the consent was voluntary, noting that neither party had raised the issue. Herrera-Gonzalez does not challenge that conclusion on appeal.

Faiferlick's actions, particularly because nothing had transpired during the stop to suggest that a search for contraband or evidence of a crime was necessary. Ultimately, however, the court concluded that even absent flagrant official misconduct, the uncertainty of the temporal proximity and the lack of intervening circumstances rendered Herrera-Gonzalez's consent insufficient to purge the taint of the illegal stop. Consequently, the district court granted Herrera-Gonzalez's motion to suppress.

## II.    DISCUSSION

Having reviewed the suppression hearing transcript and the video recording of the traffic stop, we conclude that the district court erred in holding that the traffic stop was objectively unreasonable.

This court reviews the district court's findings of fact for clear error and its legal conclusions about probable cause and reasonable suspicion de novo. *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006). A traffic stop is reasonable under the Fourth Amendment "if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *Id.* Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an "objectively reasonable one." *Id.*; *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (noting that "[t]he determinative question is not whether [the defendant] actually violated the Motor Vehicle Code . . . but whether an objectively reasonable police officer could have formed a reasonable suspicion that [the defendant] was committing a code violation"). While officers have an obligation to understand the law, this court should not expect them to "interpret the traffic laws with the subtlety and expertise of a criminal defense attorney," *Martin*, 411 F.3d at 1001 (quoting *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999)), and the determination of objective reasonableness "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *United States v. Smart*, 393 F.3d

767, 770 (8th Cir. 2005). Finally, the constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Federal courts of appeals, including this one, have reached different conclusions on the objective reasonableness of traffic stops based on statutes very similar to § 321.306, depending on the particular circumstances of each case. *Compare United States v. Herrera Martinez*, 354 F.3d 932, 933-34 (8th Cir. 2004) (per curiam) (concluding that the officer had probable cause to make a traffic stop where the officer observed no other traffic violations than a single fog-line crossing); *United States v. Pulliam*, 265 F.3d 736, 739 (8th Cir. 2001) (concluding that a traffic violation had occurred where the officer observed the driver drift over the fog line twice in two miles); *United States v. Alvarado*, 430 F.3d 1305, 1309 (10th Cir. 2005) (holding that an officer had a reasonable, articulable suspicion that the driver had committed a traffic violation where the defendant briefly crossed the fog line once and failed to point to any objective factor that might have interfered with his ability to keep his vehicle in a single lane; noting particularly the absence of any adverse weather or road conditions that would necessitate crossing the line); *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003) (concluding that the officer had "more than the necessary objectively reasonable, articulable suspicion" that the driver had committed a traffic violation where he observed the vehicle cross the center line twice), *with United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (finding no reasonable suspicion based on an isolated incident of a vehicle crossing the fog line where the road was winding and mountainous and the weather condition was windy); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (finding no probable cause based on single incident of a large motor home crossing the fog line for a few feet).

In addition, the Iowa Supreme Court's analysis of § 321.306 in *State v. Tague*, 676 N.W.2d 197 (Iowa 2004), bears some relevance to our objective reasonableness

inquiry because a state's judicial interpretation of a state statute can aid in determining whether an officer's actions had some basis in state law. *Cf. Washington*, 455 F.3d at 828 (noting that the concept of an objectively reasonable mistake of law cannot be unmooored from actual legal authority; noting the government's failure to provide evidence of, among other things, state case law that would create some objectively reasonable basis for the traffic stop where the statute clearly did not prohibit the conduct the officer thought it did); *Martin*, 411 F.3d at 1001 (noting the lack of evidence in the record of previous judicial interpretations of the statute that might aid in the objective reasonableness inquiry, given the statute's "unusual text"). In *Tague,* the officer observed no suspicious driving other than that the vehicle had "just barely crossed the left line for a brief period." *Tague*, 676 N.W.2d at 204. Given the State's "failure to prove . . . any objective basis to believe Tague's movement was done without first ascertaining that he could make such movement with safety," the court held that the officer did not have probable cause under the Iowa Constitution to stop the driver for a violation of § 321.306. *Id.*

In this case, the district court concluded that Herrera-Gonzalez's fog-line crossing could be interpreted as a reasonable response to the tow trucks ahead and that it was, in fact, safely made. It did not, however, make factual findings as to whether Herrera-Gonzalez first ascertained that the move could be made with safety or whether the position of the tow trucks in the median and on the left shoulder actually made it impractical for him to stay in the right-hand lane of the interstate. *See* Iowa Code § 321.306 ("A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."). In fact, the suppression hearing transcript reveals that after traveling 10 to 15 seconds straddling the fog line, Herrera-Gonzales crossed back into the right lane in order to cross the bridge before reaching the tow trucks. This at least suggests an objective basis for believing Herrera-Gonzalez did not ascertain that his initial crossing of the fog line could be accomplished safely. Herrera-Gonzalez then remained in the right lane hugging but not crossing the fog line

-7-

as he passed the tow trucks, which raises the further question of whether it was impractical for him to stay in his lane in the first place. Indeed, Faiferlick testified that the tow trucks' position in the median and on the left shoulder did not make staying in the right lane impractical and that he simply moved his patrol car from the left lane of the interstate to the right lane in order to avoid the tow trucks. Given these differences between the circumstances of this case and those in *Tague, Tague*'s holding does not compel the conclusion that Faiferlick's belief that Herrera-Gonzalez violated § 321.306 was objectively unreasonable.

To the contrary, under the circumstances of this stop—the 10 to 15 second crossing of the fog line, the time of day (morning), the clear weather conditions, the fact that there was a full lane of travel between Herrera-Gonzalez and the tow trucks, the lack of any additional adverse conditions that would have made it impractical for Herrera-Gonzalez to keep his car in the lane, and the fact that Herrera-Gonzalez returned to his lane to avoid the bridge and then continued within his lane as he passed the tow trucks—and given the obvious difficulty of observing from a patrol car whether a driver has ascertained that his move can be safely made, we conclude that Faiferlick had an objectively reasonable basis to believe that a violation of the Iowa statute had occurred. *See Alvarado*, 430 F.3d 1305, 1309; *cf. Washington*, 455 F.3d at 828 (noting that where there is a basis in state law for an officer's actions and some ambiguity exists that caused the officer to make the mistake, it may still be objectively reasonable).[3] We recognize that this is a relatively close question, but we believe that

---

[3]An officer's subjective motivations in initiating a traffic stop play no role in analyzing the constitutional reasonableness of the stop under the Fourth Amendment. *Whren*, 517 U.S. at 813. Thus, Faiferlick's failure to conduct a field sobriety test or pursue a line of questioning that would have investigated his stated suspicion that Herrera-Gonzalez was impaired, even if it did reveal a suspect motivation, is irrelevant to the question of whether it was objectively reasonable for Faiferlick to believe a traffic violation had occurred. Further, Faiferlick testified that when he approached the vehicle he could see that Herrera-Gonzalez was not impaired, asleep or intoxicated, which rendered that line of questioning unnecessary in any event.

based on what he reasonably knew at the time of the stop, *Smart*, 393 F.3d at 770, Faiferlick "could have formed" a reasonable suspicion that Herrera-Gonzales had committed a traffic violation, *Martin*, 411 F.3d at 1001. Accordingly, we conclude that the traffic stop was lawful.

However, even if the traffic stop were not lawful, Herrera-Gonzalez's consent was sufficient to purge the taint of the stop. We review this issue de novo. *United States v. Simpson*, 439 F.3d 490, 494-95 (8th Cir. 2006). Even if a traffic stop is determined to be invalid, subsequent voluntary consent to a search may purge the taint of the illegal stop if it was given in circumstances that render it an independent, lawful cause of the officer's discovery. *United States v. Becker*, 333 F.3d 858, 861-62 (8th Cir. 2003); *United States v. Kreisel*, 210 F.3d 868, 869 (8th Cir. 2000) (noting that in order to purge the taint of an illegal stop, the consent must be "sufficiently an act of free will"). To determine whether sufficient attenuation between the unlawful act and the consent exists, "we consider the following factors: (1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Becker*, 333 F.3d at 862. The determination is made by carefully weighing the facts of each case, and no single fact is dispositive. *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994). However, the purpose and flagrancy of the official misconduct is "the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." *Simpson*, 439 F.3d at 496.

The Government argues that the length of time between the traffic stop and Herrera-Gonzalez's later affirmation of his consent was more than sufficient for this factor to weigh in the Government's favor. However, the Government focuses on the wrong time frame. The record does not support the conclusion that the subsequent affirmation of the consent was an additional or second consent to search. Rather, it was merely an affirmance that the original consent had been given, and the proximity of an affirmance does not aid in determining whether the original consent was an

independent act of free will. *Cf. United States v. Moreno*, 280 F.3d 898, 901 (8th Cir. 2002) (noting that the "considerable" passage of time between the illegal stop, which was immediately followed by consent, and the appellant's subsequent consent to have his vehicle searched a second time reflected that the appellant's consent was an act of free will where the second consent was to a new search, not an affirmance that consent was given to the initial search).

In assessing the temporal proximity factor, we focus on the time between the illegal stop and Herrera-Gonzales's initial consent to search. As the district court correctly noted, this time frame is not clear from the record. Nevertheless, Herrera-Gonzalez concedes in his appellate brief—and the record and the district court's conclusions support the concession—that the initial consent was given within 10 to 15 minutes of the stop. While 10 minutes does not in itself suggest sufficient attenuation to purge the taint of the stop, neither does it compel the conclusion that the attenuation was insufficient. Indeed, this court has found consent given a short time after the stop sufficient to purge the taint if other circumstances indicate the consent was sufficiently an act of free will. *See United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998) (holding that consent was sufficiently an act of free will to purge the taint of the initial stop where the officer asked the defendant several times if he could search the vehicle nine minutes after the initial stop); *Ramos*, 42 F.3d at 1164 (finding consent sufficient to purge the taint where the arrest and consent were "close in time"). Thus, even assuming Herrera-Gonzalez's consent was given only 10 minutes after the initial stop, that fact alone does not compel the conclusion that the consent was insufficient to purge the taint. We now turn to the second and third factors.

With regard to intervening circumstances, the district court noted that the fact that Faiferlick declined Herrera-Gonzalez's offer to retrieve the documents from his vehicle and instead requested consent to search suggested continuity between the

illegal stop and the consent.[4] We fail to see how these facts necessarily indicate the absence of intervening circumstances.

Faiferlick testified that subsequent to his decision to initiate the traffic stop but prior to his request for consent, he was unable to verify Herrera-Gonzalez's license plates or driver's license. We have found sufficient intervening circumstances in analogous situations where prior to requesting consent, officers observed circumstances that justified seeking consent. For example, in *Becker*, after an allegedly illegal stop, officers continued to detain the defendant because they were concerned that he might be under the influence of controlled substances. *Becker*, 333 F.3d at 860. The defendant then consented to a search of his person that revealed illegal drugs. *Id.* This court noted that Becker had not been informed that he could refuse to consent but nonetheless concluded that the officers' concern about whether Becker was under the influence of narcotics was a sufficient intervening circumstance to purge the taint of the illegal stop. *Id.* at 862. In *United States v. Thomas*, after stopping travelers in a rental car and inspecting the driver's license and rental agreement, the officer noticed that there was a 2700-mile difference between the car's checkout mileage and the mileage on the odometer. 83 F.3d 259, 259 (8th Cir. 1996). Because the driver was only 400 miles from where he rented the car, the officer asked the driver to accompany him to his patrol car and asked for consent to search the car. This court found these facts sufficient to give the officer "some suspicion" that criminal activity was afoot and to support the conclusion that the consent was sufficient to purge the taint of the allegedly illegal stop. *Id.* at 260. We believe the difficulty Faiferlick had in verifying Herrera-Gonzalez's plates and identity constituted intervening circumstances that support a conclusion that Herrera-Gonzalez's consent to the search was an independent act of free will. We turn now

---

[4]The district court correctly noted that Faiferlick was not required to inform Herrera-Gonzalez that he may refuse to consent. *Palacios-Suarez*, 149 F.3d at 773.

to the most important factor in our analysis: the purpose and flagrancy of Faiferlick's alleged misconduct.[5]

"Courts have found purposeful and flagrant conduct where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" *Simpson*, 439 F.3d at 496 (quoting *Brown v. Illinois*, 422 U.S. 590, 605 (1975)). We find no evidence in the record that Faiferlick engaged in misconduct, much less flagrant misconduct. The district court concluded that the unreasonableness of the stop and the request for consent to search "where the only perceived violation was the crossing of the fog line" suggested a quality of purposefulness and investigatory design in Faiferlick's conduct. We disagree. As discussed above, this stop was objectively reasonable. But even assuming the stop was unreasonable, that unreasonableness itself does not suggest that Faiferlick's conduct was obviously improper or flagrant, or that he knew it was likely unconstitutional. An unreasonable mistake alone is not sufficient to establish flagrant misconduct. *See, e.g.*, *id.* (holding that an officer's erroneous belief that he was arresting the correct person was not sufficient misconduct to require suppression of post-arrest statements and bullets obtained from arrestee's person; an "unreasonable mistake of fact . . . does not constitute the type of blatantly unconstitutional or flagrant behavior condemned in *Brown*"); *Kreisel*, 210 F.3d at 869-70 (holding, where officers arguably made a mistake regarding the applicability of a motor vehicle regulation, that consent was sufficient to purge the taint where nothing in the record supported a

---

[5]We also note that this court has found consent sufficient to purge the taint even in the absence of intervening circumstances where the circumstances suggest that the officer was not trying to exploit an illegal situation and his conduct was in good faith. *Ramos*, 42 F.3d at 1164. As the following discussion explains, we see no evidence in the record that Faiferlick was trying to exploit an illegal situation or that his conduct was in bad faith.

-12-

conclusion that the police purposefully engaged in misconduct and where the unlawfulness was "certainly not flagrant"); *Ramos*, 42 F.3d at 1164 (holding that consent was sufficient to purge the taint where the arrest and consent were close in time and there were no intervening circumstances, but the officer's conduct was in good faith and the *Terry* violation was not flagrant).

We also disagree with the district court's conclusion that Faiferlick's actions suggested an impermissible investigatory design. We believe the crux of the district court's error was in concluding that Faiferlick's questioning and request for consent to search was unjustified because it was based solely on a fog-line crossing and, therefore, suggested misconduct. At the time of the questioning and request for consent, the difficulty in verifying the plates and driver's license had given Faiferlick a reason to be suspicious. Nothing in the record suggests that Faiferlick had an investigatory purpose prior to discovering problems with the plates and license or prior to the stop which constituted the alleged misconduct. There is no evidence that the stop was designed to "turn something up," that Faiferlick acted in bad faith in asking for consent to search, or that Faiferlick was attempting to exploit an illegal situation. *Ramos*, 42 F.3d at 1164. If Faiferlick was seeking to exploit an illegal situation, we doubt he would have called Infante in an effort to verify that consent had been given and to ensure that he had a record that Herrera-Gonzalez had been read his *Miranda* rights.

Given our conclusion that there was no misconduct (and even if there was, it was certainly not flagrant, *see Kreisel*, 210 F.3d at 870), and the particular importance of the misconduct prong to our analysis, we conclude that Herrera-Gonzales's voluntary consent to the search of his vehicle was sufficiently an act of free will to purge the taint of the allegedly illegal stop.

## III.   CONCLUSION

We hold that the district court erred in concluding that the traffic stop was unlawful.  However, even if the stop were unlawful, Herrera-Gonzalez's voluntary consent was sufficient to purge the taint of the stop.  Accordingly, the evidence discovered by the consented-to search was not made inadmissible by the Fourth Amendment.  We therefore reverse the district court's grant of Herrera-Gonzalez's motion to suppress, vacate the suppression order, and remand for further proceedings consistent with this opinion.

_____